OPINION OF THE COURT
Lee H. Elkins, J.
This matter is before the court for decision following fact-finding. The respondent is charged with obstructing governmental administration (Penal Law § 195.05), resisting arrest (Penal Law § 205.30) and menacing in the third degree (Penal Law § 120.15).
Evidence at fact-finding established that on June 11, 2009, at about 11:00 a.m., New York City Transit Police Officers Santi and Cruz evicted the 15-year-old respondent Armell N. first from the A train, and then from the transit system. The officers testified that as they entered the A train at the Borough Hall subway station, they observed the respondent and another young man with their feet on the seat, occupying more than one seat in violation of Transit Authority rules. Officer Cruz testified that he told the respondent twice to put his feet down. The respondent “stomped and cursed,” but complied with the order. Officer Santi testified that a few stops later, the respondent was staring at the officers and they “looked back at him.” The respondent said to the officers: “What the f— are you looking at?” Officer Cruz testified that he asked the respondent “what was [his] problem,” and asked the respondent in turn what he was looking at. The officers conferred and decided that at the next stop they would remove the respondent from the train. According to Officer Cruz, he was to be removed “for being disorderly and disrespectful.” According to Officer Santi, the respondent was being removed “because he was creating a public alarm and scaring the other passengers.” The train stopped at the Euclid Avenue station in Brooklyn. Officer Santi approached *530 the respondent as Officer Cruz held the train doors. Officer Santi told the respondent three times to “get off the train.” The respondent did not leave the train. The respondent declared that he was not getting off of the train and told the officers to “go f — .” Officer Cruz then informed the respondent that if he did not get off of the train, the police officers “were going to forcibly remove him.” Officer Cruz held the train door with his leg, while Officer Santi grabbed the respondent’s forearm and forcibly escorted the respondent from the train. Officer Cruz told the respondent that he was being removed from the train “for being disorderly, occupying more than one seat, and people seemed alarmed.” After being removed from the train the respondent was “irate,” “still cursing and flailing his arms, being disorderly.” Officers Cruz and Santi then decided to eject the respondent from the transit system. They informed the respondent that he was being ejected. Officer Santi grabbed one forearm as Officer Cruz grabbed the other forearm, and they escorted the respondent out of the subway station through the exit gate. Officer Santi testified that he informed the respondent that if he came back into the transit system, he would “be arrested for trespass.” When the respondent arrived on the mezzanine, outside of the station entrance, he took his Metro-Card out of his pocket and reentered the station through the turnstile. Officer Santi testified that as he reentered the respondent came running in, charging toward the officer, arms swinging “like out of rage.” Officer Cruz testified that as he reentered, the respondent “flailed his arms and hit officer Santi on the right side of the forehead.” Officer Santi did not recall being hit. Both Officer Santi and the respondent fell to the station floor. Officer Cruz got behind the respondent and tried to handcuff him for “not following a lawful order,” and “not allowing us to perform our duties as NYC police officers.” The respondent kept his arms under his chest to avoid being handcuffed. Ultimately, the officers were able to place handcuffs on the respondent.
The presentment agency variously argues that the respondent obstructed governmental administration when he refused to leave the train, and when he ran back into the station flailing his arms. The presentment agency argues that the respondent was subject to eviction from the train because he had his feet on the seat, and because he cursed at the police officers. According to the presentment agency, the former is specifically prohibited by Transit Authority regulations. As for cursing at the officers, *531 the presentment agency asserts that the regulations are “not exhaustive, but merely illustrative.” The presentment agency asserts that “it is implausible to create guidelines which anticipate every single scenario in which an individual police officer is authorized to eject someone from the system.” In any event, the presentment agency argues, the respondent “created a dangerous situation for the other passengers riding the train and created public alarm when he began cursing at [the] officers.” The presentment agency argues further that “once on the platform the respondent impeded the safe flow of traffic when he continued to curse at police and began flailing his arms at police while refusing to leave the station.” Eventually, the petitioner argues, he resisted arrest for obstructing governmental administration when he laid on his arms and refused to be handcuffed. The petitioner also argues that the respondent intentionally placed Officer Santi in fear of physical injury when he ran toward him flailing his arms, upon reentering the station.
The elements of obstructing governmental administration are preventing or attempting to prevent a public servant from performing an official function by means of force, physical interference or an independently unlawful act. (Penal Law § 195.05.) By judicial construction, the official function must be proved to have been a lawful exercise of public duty. (Matter of Shannon B., 70 NY2d 458 [1987]; People v Greene, 221 AD2d 559 [2d Dept 1995]; and see People v Perez, 47 AD3d 1192 [4th Dept 2008].) The respondent’s intent must have been to prevent the public servant from engaging in a specific official function. (People v Joseph, 156 Misc 2d 192 [Crim Ct, Kings County 1992] [“being on duty” was not an official function]; cf. e.g. People v Coffaro, 52 NY2d 932 [1981] [interfering with execution of a search warrant]; Matter of Joshua C., 289 AD2d 1095 [4th Dept 2001] [interfering with investigation into a domestic dispute].) The means of obstruction or impairment must include physical interference. (People v Case, 42 NY2d 98 [1977].) General refusal to cooperate with the police does not violate the statute. (People v Ferreira, 10 Misc 3d 441 [Crim Ct, NY County 2005]; and see People v Perez, supra.) The statute has been so construed to prevent its application from being without limit. (People v Case at 103.)
Consequently, it is necessary for the presentment agency to prove that the officers were lawfully engaged in a specific official function, which the respondent intended to impede. *532 Similarly, the presentment agency must prove that the police were lawfully arresting the respondent, in order to establish all of the elements of resisting arrest. (People v Perez at 1193; see Matter of Shannon B., 70 NY2d 458 [1987].)
In essence the presentment agency’s sole contention is that the respondent intentionally impeded the officers from engaging in the official function of ejecting him from the train and from the transit system. The authority of a transit police officer to eject a person from the transit system is established by the Rules Governing the Conduct and Safety of the Public in the Use of the Facilities of New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority. (21 NYCRR 1050.1 et seq. [rules].) These rules are promulgated pursuant to Public Authorities Law §§ 1203-a, 1204 (5-a) and § 1209-a. Under 21 NYCRR 1050.11 (a): “Any person who is observed by a [transit police officer] to be violating any of these rules and who may receive or has received a notice of violation therefore is subject to ejection from the facilities.” Under 21 NYCRR 1050.7, entitled “Disorderly Conduct,” no person in any facility shall: “(i) conduct himself or herself in any manner which may cause or tend to cause annoyance, alarm or inconvenience to a reasonable person or create a breach of the peace; (j) (1) occupy more than one seat on a station, platform or conveyance.” The presentment agency also cites section 1050.6 (d) (1): “All persons on or in any facility or conveyance of the authority shall: (1) comply with the lawful orders and directives of any [transit] police officer or other authority employee acting within the scope of his or her employment.”
The evidence shows that the respondent upon being told to desist from occupying more than one seat on the train did so, however reluctantly. The rules specifically require that the person who is observed to be in violation of their provisions, “ha[ve] received a notice of [such] violation” prior to ejection. (21 NYCRR 1050.11.) It follows that a person who has received notice of the violation and thereafter complies is not subject to ejection. Consequently, the court does not find that the officers were justified in ejecting the respondent from the train for occupying more than one seat. Nor does the court find that the respondent violated section 1050.6 (d) (1), by failing to comply with the lawful directive of the transit officers to remove his feet from the seat. The only arguable basis for the officers to eject the respondent from the train, therefore, was his statement to them.
*533 It is clear that the respondent was not subject to an arrest by virtue of his provocative inquiry to the officers, “What the f— are you looking at?” Arguably, the police may have construed this comment to constitute disorderly conduct. (Penal Law § 240.20 [3].)* However, the respondent, as a juvenile, would not be subject to an arrest for the violation of disorderly conduct. (Family Ct Act § 305.2; Penal Law § 10.00 [6].) The presentment agency does not argue that the officers believed the respondent to be over the age of 16. (Cf. e.g. Matter of Charles M., 143 AD2d 96, 97 [2d Dept 1988].)
Therefore, the presentment agency is relegated to the argument that the respondent violated the transit rules provision regarding disorderly conduct as a basis for ejection from the train. The provision states that no person in any facility shall “(i) conduct himself or herself in any manner which may cause or tend to cause annoyance, alarm or inconvenience to a reasonable person or create a breach of the peace.” (21 NYCRR 1050.7.) In effect, the presentment agency equates this rule with Penal Law § 240.20 and argues that the respondent’s statement created a risk of public inconvenience, annoyance or alarm. Although the officers testified that in their opinion the respondent’s statement was alarming to the other passengers, in fact the record is completely lacking any detail in this regard. There was no evidence any person indicated in any manner that they overheard the respondent, or in any way expressed any “inconvenience, annoyance or alarm.” Even were the court to consider the risk of “alarm” in the absence of any evidence of an actual occurrence, there is nothing to prove that any such risk was created by the respondent’s statement. The record is entirely lacking any specifics regarding the number of other passengers, where they were positioned in relation to the respondent, or whether the statement was likely to be overheard. Evidence of this kind is necessary to establish that the respondent’s statement “may [have] cause[d] or tend[ed] to cause annoyance, alarm or inconvenience to a reasonable person or create[d] a breach of the peace.” Historically, “breach of the peace” has been equated with “public inconvenience, annoyance or alarm,” as used in the disorderly conduct section of the Penal Law, and does not encompass annoying statements to po *534 lice officers which create no actual risk of causing a public disturbance. (People v Munafo, 50 NY2d 326, 331 [1980]; and see People v Ferreira, 10 Misc 3d at 445; cf. People v Todaro, 26 NY2d 325 [1970] [evidence of refusal to move and obscenities toward police officer in Times Square].) As one appellate court observed: “a private annoyance to the officer, and in the absence of testimony showing that there was a breach of the peace, or that it attracted undue attention or caused consternation amongst any[one else] ... is insufficient to constitute disorderly conduct.” (People v La Sister, 9 Misc 2d 518, 519 [Ct Spec Sess, Appellate Part, 1st Dept 1958].) Cases in which there has been an affirmed finding of fact that the respondent caused a public disturbance are distinguishable. (Cf. e.g. Matter of Quaniqua W., 25 AD3d 380 [1st Dept 2006]; Matter of Eric A., 66 AD3d 603 [1st Dept 2009].)
Similarly, there was no evidence that the respondent’s actions actually impeded anyone’s egress to or from the train or the station, or otherwise violated any provision of the transit rules. Nor is there any evidence in the record to indicate that members of the public were disturbed by the respondent’s continuing verbal protest after being removed from the train, as to justify his ejection from the station.
Additionally, the adolescent respondent received no warning that his failure to desist from making such statements as might “annoy, alarm or inconvenience” other passengers would result in his ejection from the train, as required by 21 NYCRR 1050.11. This eminently reasonable requirement strikes an appropriate balance between the public’s interest in quiet enjoyment of the subway and the individual’s right to arrive at his destination. Adolescents in particular are susceptible to provocatively poor judgment when confronted with an official assertion of authority. (People v Todaro, 26 NY2d at 330.) Moreover, it is equally reasonable to require police officers to issue specific and direct notice to the juvenile that failure to desist would result in consequences. (See Matter of Davan L., 91 NY2d 88, 91 [1997] [noting that “the juvenile was put on specific, direct notice” not to get involved in a police undercover buy operation].) Finally, the officers also had an obligation to ensure that the respondent, as a juvenile, had the ability to arrive safely to his destination.
For the foregoing reasons, the court finds that the presentment agency has failed to prove beyond a reasonable doubt that the officers properly applied the transit rules in removing the respondent from the A train or from the Euclid Avenue station. *535 Consequently, the court concludes that the presentment agency failed to prove that the officers’ action was lawful, an essential element of obstructing governmental administration. Since the court does not find the respondent’s removal from the train or from the station to have been lawful, he was not subject to arrest for obstructing governmental administration when he failed to comply with the order to leave the train or when he reentered the station by paying his fare. Therefore, the presentment agency also failed to prove an essential element of resisting arrest. Finally, the court does not find beyond a reasonable doubt that the respondent’s intent in reentering the station, arms flailing, was to place Officer Santi in fear of physical injury, as required for menacing in the third degree. Rather, the court finds that the respondent’s intent was to demonstrate to the officers his continued frustration with their actions. His arm flailing created a risk that he would come into physical contact with the officers, but under these circumstances does not support the inference that he intended to place Officer Santi in fear of physical injury.
The petition is dismissed.

 Penal Law § 240.20 states: “A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture.”